Page number 24-1259 et al. Office of the Commissioner of Baseball et al, the balance versus Librarian of Congress et al. Ms. Theodore Ford-Phelan, Office of the Commissioner of Baseball et al. Mr. Dell Ford-Phelan, Public Broadcasting Service. Ms. Carson for the Apple East. Mr. McClain for the Intermediates. Morning, Council. Ms. Theodore, please proceed when you're ready. Good morning. Elizabeth Theodore, on behalf of the Joint Sports Claimants, I'd like to save five minutes for rebuttal, if possible. The Board's allocation decision must be vacated for three independent reasons. First, the Board relied on an arbitrary regression that produced absurd results. Second, the Board applied an arbitrary adjustment to the survey that it admitted lacked any rationale. And third, the Board synthesized the regression in the survey in an arbitrary way, resulting in an allocation for sports in 2014 that inexplicably fell below sports' share under either method the Board purported to be crediting. So let me start with the regression, which absurdly concluded that live sports games that cable systems pay tens of millions of dollars to air on the open market were the least valuable content category. The regression was so imprecise that the Board had to resort to the 55% confidence level, and even then, it couldn't exclude the possibility that sports had a negative value. This is at JA 511, that airing live NFL games reduces the value of your channel to cable systems. And that's just totally outside the range of acceptable scientific evidence. When this court approved reliance on a regression previously in the 2020 program suppliers decision, it said it was non-arbitrary because the regression produced narrow confidence intervals at 95% confidence. Here, at 95% confidence, the regression can't tell you whether commercial television should get 6% or 20% in 2016, also at JA 511. And that commercial television, that's one of the categories that the Board says that the regression does accurately measure. The Board itself found that the regression could not accurately measure half of the claimant groups, so that's sports, Canadian, and devotional, which amount to between 35% and 42.9% of the royalty pool. And this issue was presented to the Board on rehearing. So there were certain issues presented to the Board on rehearing relating to the acceptance of the Tyler above minimum fee regression, which was a regression that nobody had proposed. But I think the Board did not respond to any of these absurdities and neither has, notably, neither has the And what I'm getting at is motions for reconsideration were requested, were filed, excuse me, and granted. And there was briefing and the Board made decisions and indicated, A, you second-bite at the apple, but B, said that you have to show clear error or manifest injustice, all right, for it to take up an issue. So what's your response to what the Board did in that context? Because before us is both a legal decision and the decision on rehearing. I don't think that the standard the Board applied on reconsideration with respect to sort of clear error has anything to do with the standard, the normal APA substantial evidence arbitrary capricious standard that this Court is going to apply. No, I don't disagree with you. That's what the Board said and that's what I'm trying to clarify here. The Board said your burden, claimant's burden, in seeking rehearance is to demonstrate clear errors or manifest injustice. And so in some instances the Board said the parties haven't presented such evidence, but they said we'll go ahead and discuss the merits of the argument that's being made. And so it goes on. And so while we're on an APA standard review of the Board's decisions, we have to take into account what it said in response to the arguments that were made in connection with rehearing, correct? I think any substantive points it made, certainly, but I don't think it had any substantive responses to the things I'm saying. I don't think that, I don't think that the sort of... So these issues are being raised before us for the first time or you're saying you raised them, but they were never addressed on rehearing. So I'm saying we raised many of these issues at the actual original Board determination level. I think a lot of what the Board was saying about second bite of the apple is basically like, look, you already raised these, we address these, we're not going to address them again. Unless you can show clear error or manifest injustice. Yes, Your Honor, but I think it's... All I'm trying to get at is you quoted, all sides have quoted, what our court has said about our review under an APA standard of these types of Board allocations. We're talking about rough justice, right? So I'm trying to understand what it is that we should be looking at in terms of the Board says, we've read your motion for reconsideration, there's nothing new here, there's nothing that shows clear error or manifest injustice. So where the court has an APA standard of review, but we're looking for rough justice, we're not looking for precision. How do we put all that together? I think that what the court has said is that you have to have a non-arbitrary method of allocation. And I think what the method the Board chose is arbitrary. And I don't think that the sort of re-hearing standard is really relevant here in the same way that, you know, this court might deny en banc review or panel re-hearing because there's nothing new and that wouldn't affect how the Supreme Court reviews the underlying decision. So is the underlying argument here that the Board, in adopting the methodology it did, inadequately explain why it chose particular allocation numbers for the various claimants? That is one of our many, I think that is our third argument. I'm just trying to get this under my belt in terms of when you say, well, they were arbitrary, they did this, they did that. Had the Board explained why it chose those numbers, we might be in a different position in addressing your arguments. That's what I'm trying to understand. Yeah, I think had the Board done a different set of arguments, you would be in a different, better position. But I think what the Board has to have is it has to have a non-arbitrary method that's supported by substantial evidence that suggests that the numbers it's choosing from are correct, that they actually reflect marketplace value. And so the Board says all the parties have proposed various methodologies. We've looked at them all. And we've made some decisions and determinations about the methodology. And while we like Tyler best, there are some problems there. And while we like the survey, there are problems there. And everybody agrees that what period of time the Board is addressing is different from the past. So the Board says, you know, the normal procedure isn't going to work. And I don't hear arguments being made other than to say, well, the Board should address our position as distinct from what the Board has done. Well, can I just, I'd be happy to just sort of very specifically address why what the Board did was arbitrary, which I think we'll get, we'll get it, we'll get at your question. So with respect to the regression, so the Board said we don't think, we think 90% of the relevant data is completely irrelevant and can't be included in the regression because it's based on people who are not making economic decisions. And then what it says is we're going to accept a regression that throws out 90% of the data. Nobody proposed that regression. Nobody. Dr. Tyler did not propose that regression. He did not suggest it should be used. And then what that regression does is it produces totally absurd results. And even, which the Board acknowledged for many climate categories. And Dr. Tyler himself said, and this is at JA 343, if a regression is wrong for one coefficient, all of the other coefficients are likely to be biased as well in unknown directions. He said himself, Dr. Tyler said himself, that a badly measured variable contaminates all of the And the Board finds that many of these variables are wrong, are badly measured. The regression reports that the infomercials are entitled to 7.3% of the royalties, even though everyone agrees they have no marketplace value. Okay, on this, so didn't Tyler say about the sensitivity, his sensitivity model as opposed to the baseline model, the sensitivity model, which only looks at the above minimum fee ones? So I thought he said, considering a version of the model, including only above minimum fee CSOs does have some merit. He did. He said some merit. He did. So it's not, I mean, by his own estimation, it's not outlandish to look at this. He says it has some merit. And then he goes on to explain why it has some merit, because that's going to be the best in indication of a revealed preference. That still may be, I mean, you may still have some problems with it. But based on Tyler's own assessment, he's not warding people off from looking at that. He's saying, yeah, that could have some merit. And because it, you know, maps onto revealed preferences in a way that's more telling. He says that it has some merit sort of to corroborate the original survey that the Board, original regression that the Board finds is is wrong. But he says it's too extreme. And what he actually says is what he says is that, you know, as to that 10%, we have some basis for thinking they're making economic decisions. He doesn't say that that means that the above minimum fee regression is accurately mapping 100%. And again, I mean, but even putting aside what Tyler said, I mean, overwhelmingly, the actual results here show the absurdity. Fifty-five percent confidence interval. That's ridiculous. Nobody, no scientist would accept that. The Board does not suggest that any scientist would accept that. So just help me understand. So what the Board says at J511, if the judges take note of the 55 percent confidence level and then go on to give a statement as to why, what does it mean to take note of it? Because when I'm looking at the table, I see a 55 percent column, I see a 90 percent column, I see a 95, I see a 99. Of course, the range gets narrower as you go to the left because the confidence is getting less. So that makes sense to me as an intuitive matter. But there's also these other columns. And so the columns all have ranges in them. That's the, but for the, to the extent that the Board took into account the regression, I don't think we think they took into account a range. I think they took into account some value that's in that range. So if they took into account some value that's in that range, and maybe it's the left-hand most column that's labeled the share, I'm not sure you can tell me about that, but whatever the value is in that range, if it's in the range of all of them, what does it mean when the Board says, I'm taking note of the 55 percent column, when the value that they're ultimately using, to the extent they're using the regression for a particular category, is also within the range for the other confidence intervals too. Right. So, I mean, if you look at like the 95 percent confidence interval, right, for commercial television, right, which for 2015 is between, you know, 7 percent and 15 percent, and for, you know, for 2016, it's between 6 percent and 20 percent. So the regression isn't telling you anything about the particular confidence that it's any, that the actual value for CTV is any particular number within that range, right? What it's telling you basically is that, you know, if you repeat this 100 times, 95 percent of the time, you're going to get some number in that range. But the level of imprecision here, maybe, maybe commercial television is 6 percent, maybe it's 20 percent. I mean, that's an enormous level of imprecision when you're trying to allocate 100 percent between six different claiming categories. And again, that is one of the categories the Board said could be accurately measured. It acknowledges that these numbers are wrong for sports devotional Canadians. I mean, for Canadians, it says they're so wrong that we're going to splice back in this prior regression that we just said is completely bunk for sports. Even at the 55 percent confidence interval for 2016 and for 2017, the numbers are the range is negative. Right. And so that's really remarkable. What this regression is doing is even at the lowest amount of confidence, even if you're just saying the confidence of a coin flip, it can't exclude the possibility that having sports lowers the value. And that's just wrong. And that shows that the regression is wrong. I think it's also the case that every single economist, every single regression expert other than Dr. Tyler said that the reason this regression is totally wrong is because it's trying to regress minutes of sort of a category against this rate that's set by a statute that isn't a market price. And so it's just mimicking the statutory formula. There's no reason, even putting aside the total imprecision here, there's just no reason to assume that the numbers, the regression is spitting out are actually reflecting the marketplace value of a minute. Right. So there's the imprecision issue. And then there's the question of like, well, you have a regression and it gives you some numbers that say you multiply minutes of a content category by your coefficient, which is supposed to be the marginal value of a minute. And then you get the end result. You have to have some economic basis, some rationale for thinking that those coefficients actually represent the marketplace value of a minute, as opposed to just representing some correlation that's totally unrelated to marketplace value. And so this is what Dr. Rubenfeld, you know, who's this economist from Berkeley, he's the one who wrote the regression chapter for the Federal Judicial Center's manual on use of scientific evidence. And the board dealt with his testimony. I'm sorry? The board addressed. No, the board did not address this issue, Your Honor. They certainly talked about what he said and what his opinion was. So I think the board says at some point that it will address the arguments that Heiler's regression just mimics the statutory formula. See, that's what it says. And if you go to Infra, there's no actual there's no actual discussion of this particular point. They don't. I mean, they did discuss the expert testimony that was authored by two, not only Rubenfeld, but the other. Yes. All right. And had problems with it. So it's not as though it ignored it, but I just want is a result of your analysis here that the board had no choice other than to use surveys. Our view is that the survey was the best the survey was the best evidence on this on this record. That's right. Because the board says after it goes through its explanation about why the Tyler sensitivity analysis is what it's going to follow with all these adjustments, it says and none of the other regression analyses were pressed upon us. All right. So it's used as even though people propose these other ways of looking at it, there were all kinds of problems there, which the board discussed. So they were left with Tyler with these various adjustments. But your point is that because we come up with a ridiculous, absurd result, it's clear the board had no choice other than to use the survey. That's right, Your Honor. We were not suggesting that any of the regressions the board rejected were better. Our view is that given the actual data in this context, you just can't use a regression. You can't. Can I just make sure I understand your stake in this? So as I understand what the board ultimately did for the for JSC, actually, the regression didn't play much of a role in pegging the JSC number. It played more of a role in the PTV number. And then the point for you is, well, if it played a role in the PTV number, they necessarily played a role in our ultimate allocation, too, because we're talking about a zero sum game with an odd. Correct. But where you get there is if they didn't, in other words, excluding the regression altogether, it might not actually affect very much where the board started for CSC, at least if they base CSC on the survey. But it would affect where the board could have started with PTV. And if it affects where the board could have started with PTV, then it necessarily has a feedback effect on you. That's correct, Your Honor. And our numbers were lower than the numbers that the our ultimate sort of synthesized numbers were lower than the numbers that the board awarded us under the adjusted survey that the board accepted. And every year they were they were lower than the our survey numbers. And in 2014, they were lower than our regression number and our survey number, which I think no one has any response to or no one has any explanation for why that's not arbitrary. I think there is a response to that, actually, because I thought on just on that narrow point, it may not it may not affect the rest of this. But I thought what the board said in the reconsideration decision, that maybe this is irrelevant for a reason I'm not exactly following, it's on J.A. 562, is that in 2014, the allocation slumps to marginally greater than 100 percent and the judges therefore adjusted the allocation shares proportionally to achieve an aggregated allocation of 100 percent. The 2014 shares, this process required a modest downward adjustment. And so for requires a downward adjustment, then you might not understand the strike and you could understand why it would go lower. That's in response to a different error. So they made an adjustment that I think I think that was an error raised by PTV, that there was some mistake in 2014 that the numbers didn't add up to 20 to 100. And they changed the adjustment so that the the value for JSC in 2014 in the initial determination went very modestly up in the final. I didn't understand this to be a response actually to a particular error. I thought this was just a general method that they followed because they had to get everything to add up to 100. And for 2014, all the numbers totaled together exceeded 100. So they had to reduce them all. But I mean, we can I don't, I don't think that that's responsive at all to the point that we're making, which is that our number is is lower than both of our than both of our allocations under the under the what the board purported. But I understand that point. I think this is I don't think I don't think it is. I mean, the government really didn't argue that was and it's not and I don't think I don't think it's the case that anybody else's number was lower than both of their I ask you about sports in particular because you raised this question about and the negative values is another thing. I mean, I take the point on a negative value being potentially surprising. But in terms of the sports value going way down after 2014, what as if I understand the context, what we're talking about is retransmission of local broadcast, right? Let me let me address that. If that's so, if I can just finish what you may already anticipate where I'm going with this, but if WGN was the big elephant in the room at this point, I take it that what that means is that people in California who want to see the Cubs, they WGN local broadcast of WGN to them is how a person who moved from Chicago to somewhere else can see the Cubs. And it turns out that that was the one that was doing all the work in this area. I mean, I think I don't even think you dispute that taking J WGN out of the field of vision had a pretty dramatic effect on the value of local of retransmitting local channels, because this was the local channel that actually turned out to be the one that was left that everybody cared about. So if that's true, it doesn't seem to me to be altogether surprising that after taking WGN out of the field of vision, because it's no longer broadcast, it's not going to be on cable, then there's just not that much left that's locally available that needed to be rebroadcast for people to see. We're not talking about the World Series. We're not talking about the Super Bowl. We're not talking about those things. We're talking about the rebroadcast of a local feed of which WGN was the major one. Yes. So let me let me address that. And we are talking about the World Series and Super Bowl and I'll turn to that in a minute. But with respect specifically to the number of unique live sports games that are transmitted every year in 2015 to 2017 is 2200 unique live sports games a year. That's at SGA 15 and 121 to 122. That is more than the number of unique live sports games that is transmitted in 2014. So what the difference between WGN and the rest of the stations that are being distantly retransmitted is that WGN is being retransmitted because it's a superstation that's being retransmitted to many more subscribers across the country. That's the issue. But it's not different in kind. So WGN is retransmitting, you know, Cubs, White Sox games, that sort of stuff. So let me talk a little bit about what is being retransmitted in 2015 to 2017 after the conversion. So it's the same kind of thing. So this is at SGA 123 to 130. So what's being retransmitted here is New York City channels that carry Mets and Yankees games are being retransmitted to subscribers in Philadelphia, New Jersey, upstate New York, who don't have access to those games. Same thing for Giants and Jets games. Fox and NBC affiliates in Philadelphia that are carrying Phillies and Eagles games. Those games are being retransmitted to other areas of Pennsylvania, New Jersey, Delaware, other places where they're likely to be fans. So L.A., one of the channels that's being retransmitted here carries Dodgers games to other places outside the L.A. metro area where the Dodgers are popular. There's a NBC affiliate here in D.C. carries preseason Commanders games. That's being distantly retransmitted to places in Maryland, Virginia, Delaware that are outside the range of the local D.C. signal. Are those just preseason? Just I just want to make sure I understand. I think that the particular example on the record there was preseason, but all of the other examples I have given are not. I mean, I watch preseason, but that's a level of fandom. Yes. Maybe different. All of all of the other all of the other examples I just gave you weren't. There's a station that carries Notre Dame football to subscribers that's being retransmitted to subscribers in Ohio and Kentucky. So so if I take all this to be true, then are you I thought everybody was kind of operating in common ground that the elimination of WGN was a significant deal. And but if if all if we're talking about the New York sports, we're talking about L.A. sports, we're talking about Notre Dame football, none of that is I think what you're saying is nothing changed with respect to any of those. If that's true, then I thought even your own proposal recognized that there was a significant shift from WGN. It's our proposal recognizes that there's a shift because there are just fewer subscribers total who are getting this content. But the content is no less valuable. And let me let me talk about the World Series in the Super Bowl, because the government, I think, says in their brief, this isn't what this is. That's about that's just completely wrong. And I don't know where they got that. So there are a number of subscribers who do not have a local Fox signal. And when Fox carries the World Series, which it did in 2014, 2015, 2016 and 2017, those subscribers are only getting the World Series through the Section 111 retransmissions. That is also the case for the Super Bowl in 2014 and 2017 when it's carried on Fox. This is at SGA 130. So this absolutely includes the World Series in the Super Bowl. I mean, it could include those four, but if it's for dramatically limited numbers of people. Yeah. And why doesn't that matter? Of course, the value of sports in the abstract. I mean, it's sort of like saying if one person in America can only get the Super Bowl through a retransmission of a local broadcast, then, yes, the Super Bowl is really, really, really valuable. No doubt about that. But if it's only one person that we're talking about, then for these purposes, it doesn't seem like we'd reflect the value of sports in the abstract as the relevant criteria. We're not disputing that the value of sports should have gone down because the quantity that was retransmitted went down in the survey does reflect it. It's just that it doesn't go down as much as that as the board found. And so in particular, I think one of the relevant points here is that, you know, it makes things more valuable. And also that, I mean, when people are getting television, like it doesn't really matter that you might, you know, getting 30 extra hours of Seinfeld reruns that you can watch on Netflix or getting 60 extra hours of Seinfeld reruns that you can watch on Netflix. That's there's no real difference in the value there as compared to the two hours of a live sports game that you can't watch on Netflix. But so can I try to get some sense of you back again about you talking about this regression analysis, because that's long been used to infer value. So are you saying that there should be a categorical denial of that type of process and you prefer that we only look at surveys or are you just attacking the regression analysis here? Yeah, we're not saying that the court has to conclude that no regression ever in this context, no matter what, what we're saying is that given the data here, which where you have to throw out 90 percent of the transmissions and given the absurd results that it produces, you can't use a survey in this context. And given the fact that you don't actually have a mark. Can't use regression. Oh, I'm so sorry. You can't use a regression in this context. Thank you for that correction. OK. And if I just wanted to I mean, there's going to be winners and losers just like winners in sports. And so what are you taking us to in terms of a specific approach that is fair across the lines, because there was a lot of information in this record, a lot of deference to statisticians, you know, other experts, et cetera, that the court generally refers to as long as it's reasonably explained. And so do you have a specific formula that you're asking us to go to that, you know, makes it fair to all parties, not just the show? Yes, we think so. And I know I've gone way over my time. I would like to talk about the survey adjustment problem for a few minutes if I can. But we think that the court should hold that on this record, using the regression was arbitrary and irrational. We think the court should hold that the survey, as the board found, you know, is something that gets directly at marketplace value by literally asking the cable systems how what the marketplace value is. We think the court should remand for the board to reconsider the adjustment that it applied to the survey. And let me talk about that for a few minutes. Can I just ask you a question? You've got the board making some findings of J.A. 546. They say they categorically reject JSC's argument that they asked inconsistently and thus clear error by giving less evidentiary weight to minimum seed royalty. You can read that and you're probably more sophisticated than I am. But the point is, we need to do something or you need to be able to give us something in response to that because the board is saying that, you know, your own witnesses don't support your own findings. Yeah, I mean, I don't I don't think what the board is saying here is a reasonable explanation. I'm just trying to figure out on J.A. 546, because, as you know, it's a long, long opinion. So I'm just looking at J.A. 546. It's in column A and it's the judges categorically reject. About halfway down the column, yeah. And they take your each of your arguments and they say specifically JSC argues on re-hearing that. Yes, this is a this is a response on this issue of the McLaughlin adjustment that they applied to the to the survey. So let me just let me just talk about that for a minute. So that adjustment takes every PTV only system and assumes that it values PTV at 100 percent, even if it's barely transmitting any PTV to subscribers and even if that same system had valued PTV at 8 percent in 2014. But I think the main point about this survey has been used for a couple of decades. Adjustments have been used previously, but they never made any difference. So in 2014, this we're not objecting to the use of this adjustment in 2014. It changes the sports allocation by like point one. So it just didn't make any difference before. And now it does make a difference because there were a lot of systems that were PTV plus WGN and now they're PTV only. But you don't have to agree with anything I say. All you have to do is take what the board said about why the adjustment it applied was arbitrary and gracious. It says, quote, there is no rationale for all. This is a J537. It says there is no rationale for augmenting the survey results with the McLaughlin adjustment for all the PTV only systems that come into existence after 2014. That's what it says. And that is why it refuses to credit the McLaughlin adjustment for PTV. The McLaughlin adjustment in 2015 to 2017 would have raised PTV's average allocation from like 7.5 percent to 46.7 percent. So this is in column B, right? So I'm in the middle. Yet with respect to PTV, yeah, yes. Yes, with respect to PTV, basically what it is saying here is that the McLaughlin adjustment produces such an absurd increase in PTV's numbers that we've refused to credit it for PTV. And so. If that is true. It is completely arbitrary and inconsistent to use that exact same adjustment to lower sports' value, and that's what they're doing and nobody has any response to that. Your Honor, Judge Rogers, the board has not responded to that point and the government has not responded to that point at all. Nobody can explain why it's recent decision making to say this is crazy, but we're going to use it for sports. And there are like a number of obvious reasons why it's totally crazy to make this assumption. So a full third of the PTV only systems are must carry. They're literally required to carry PTV by statute. And then 57 percent of the PTV only systems are actually only carrying PTV locally, just in the same way that they're carrying stations that transmit sports locally. And there's just this bizarre statutory quirk that says when you carry PTV locally, it counts as distant. So nobody's making any choice to carry PTV over local commercial stations with sports and news and movies in those in those systems. The upshot of this is, just if I'm understanding the overall architecture of the argument, it's that the board shouldn't consider regression at all. It should only consider survey. Yes. But actually, it shouldn't consider survey in the way that it considered the survey. It should consider the survey in the way you want them to consider the survey. And the way you want them to consider the survey is they can't do the McLaughlin adjustment. That's part of it. You have a problem with the adjustments to the survey that they made. They can't do the version of the McLaughlin adjustment that they did. We've proposed two alternative adjustments that we think are an adjustment to. That's right. And again, we would be totally fine with the court remanding for the board to pick a different adjustment. I mean, I think, you know, the import of this court's decision in this settling devotional claimant cases, you know, the board can't just say, well, we have bad evidence that we're picking something that's not. It can't do that. So I think it's very, very clear on this record that the adjustment the board chose was arbitrary. And so, you know, look at column C. Yes. This is still on 537. Yes. So ample evidence in the record. The SBC provides niche programming. Blah, blah, blah. And that niche value of SBC has been reflected well in the board surveys received in this proceeding. You see that? Yes, Your Honor. So, I mean, they heard you, but they said they thought the value was reflected. Reflected well. So for the settling devotional claimants, they said that the survey reflected them well, but that's different than for the for JDS. And that's really where the rubber meets the road with this adjustment, where they say that that adjustment is absurd. And, you know, I'm happy to talk about our two adjustments. I mean, I think they were they were good adjustments. I think, you know, I think it's pretty clear that the board's reason for rejecting our second adjustment, which was that we hadn't offered, is just totally wrong. It's right there in the record. But I know I'm way over my time. So. So then can we just talk for a minute about a point that I think you noted and then briefed, but we haven't gotten to yet, which is the way that all this gets hashed out in the end and put together, because I think it's part of your submission is and this is most evident on the same page, 537, and then on reconsideration at 561, 562, I think is the board. I think what it what it did was it thought that the survey results were help or particularly helpful with certain groups. And I thought that the regression was particularly helpful, at least with PTV. And I can't remember the reason there are many others as well. And it indicated that at least for certain years that it was going to give a special weight to one or the other for a particular group. I'm not sure that we know. And we can ask the government about this. I'm not sure that we know exactly what weight was given, but there was an indication that it was going to get a lot of weight, maybe dispositive weight, maybe heavy weight kind of words along those lines were being used. Is it your submission that unless we know exactly the weight that was given to either the survey or the regression for each grouping, then the resolution has to be set aside? But what are you basically objecting to? Because I think I think I've summed up the problem that's been identified, which is, yeah, there's some kind of qualitative suggestions that we heavily relied on this. We haven't relied on that. We dispositively relied on this. But when you look at the survey results and then you look at the regression results, neither of those is reflected in the ultimate allocations. You can kind of think that it's pretty close to one or the other in certain situations and others further away. We don't know exactly how these final figures are being arrived at. We just have some kind of description of roughly how they're being arrived at, which leaves a fair amount to the imagination, I thought was what you were suggesting in your brief. And I'm just wondering, what's the what's the upshot of that? What what what do you think the board has to do, at least as a minimum? Look, I think if it provided the actual weights, the actual numerical weights, that would be that would be the best. I guess I'm not sure whether there's something short of that that it could do. I think that what it did do is it offered a description of the weighting process that was inconsistent with the results. So I think we cited one example, like they say, they're they're weighing survey events heavily for both CTV, which is commercial television and program suppliers. But the program supplier allocation is like halfway between the regression and the survey. And the CTV allocation just matched the survey. For PTV, it says it's giving just positive weight to the regression, but PTV's allocation for 2015 to 2017 is higher by nearly three points every single year than the regression, than its regression allocation. Well, JSC's allocation is lower every year than the survey that the board said it was relying on for us. So it's just not consistent with what they said. And I think if they provided some more detail about what they were actually doing, I think that would be helpful for the parties in the court to figure out whether what they were doing was non-arbitrary. And again, I think the 2014 example is really reflects reflects the arbitrariness here in a quite clear way. That's the one where the support ends up lower. Lower than both. And I'll take a look while the other parties are going at that particular page you identified. But again, I mean, the government didn't identify that page. Yeah, that'd be totally off. But it's, yeah, yeah. So that's why I started where I did with a question to you. And that's where the Chief is ending. All right. And part of the problem is what we have before us is the board's response to the objections as it understood them and a fairly lengthy statement about why it rejected one, went with the other, tried to come up with something that it thought made sense in these circumstances. And from time to time, it says, look, we've acknowledged this, we've acknowledged that, the parties acknowledge. And what the parties haven't done is to give us anything that we think comes up with the appropriate allocations. So just to send this back to the board isn't enough. And I thought that's where the Chief's question might be headed. Because we get records like this all the time. And every time I sort of look for something, I can find something in here where the board has addressed the matter. But whoever the claimant is doesn't necessarily agree with that analysis. But that's different, even on an APA review. And so, you know, what are we signaling to the board if we say, look, you gave us, you know, I don't know how many pages on type, you know, they may not like their answers, but they didn't ignore anything. So, I mean, and just so you know what I'm getting at, and when Chief says, you know, at the bottom is your point that we need to know why it put numbers in one place or another. But I thought the thrust of your argument today is that's not going to do us any good because the analysis itself is faulty. So telling us, you know, where you put the numbers based on that faulty analysis, that's not going to resolve anything. I absolutely agree. I think that that colloquy was just about our sort of third point. But our fundamental submission is that you can't rely on the regression at all. And obviously, if the court holds that, it would avoid the issue about the synthesis. But our fundamental submission is you can't rely on the regression at all. And well, the board tells us you can't rely on the survey even. And that's why. I respectfully disagree, Your Honor. The board, I mean, the board does rely on the survey. I know, but it says it's got to make all these adjustments. It makes one adjustment for the survey. It makes three very ad hoc adjustments for the regression. And I think that, you know. I know. One big one and three little ones is two different things, depending on who's claiming, who is the claimant arguing here. So they say, the board says, you know, here we've looked at this survey. And it still finds that the Tyler model is the most appropriate regression model in this record. And I've recorded it the most late. This is, again, 537. And then it says, the board surveys provide relevant illustrations on the distant claimant. But, and then it goes on. So, I mean, isn't it enough for me to say, or hypothetically, well you can't rely on the regressions, but just use the survey data? So I, of course, I acknowledge the board says that the Tyler regression is the most appropriate in this record. And we agree that all of the other regressions are inappropriate, too. But, I mean, our fundamental submission, Your Honor, is that it was arbitrary to say that the Tyler regression was appropriate here. It may have been the most appropriate. I understand that. But I thought, and all three judges have asked you this question. You said, you want the survey data. That's what the board should have followed. All right. But the board says there's some problems with the survey. Yes. The board does say that. And I think that the question on remand, if the court agrees with us, would be just simply what's the right adjustment. But I will say the adjustments the board made to the regression are enormous. They're not small. And it's also the case that, so the, you know, the adjustment that needs to be made to the survey is to account for the fact that there's like, you know, some of these PTD-only systems. It's a small number. It's like, it's like 20%. It's like there's like 170 or so PTD-only systems. And there's like 940 or so total systems. So that's 20%. Whereas what's being thrown out of the regression is 90%. And one thing to note is that what's going on in the regression when the board is making these sort of random ad hoc adjustments is none of them are actually aimed at trying to figure out what those 90% that are being thrown out think. They're very, they're much more specific than that. There's like the random adjustment to splice back in something for the devotional claimants. And then there's a few PTD-specific adjustments. But nobody, the board isn't, the board isn't suggesting that there's any possible way to adjust the regression to account for the fact that it is throwing out 90% of the entire data. And that's different than the survey where there's a much smaller adjustment that's needed and it's specific to a set number of systems and you just have to figure out how to figure out what those systems think, so. When you say 90%, you're talking about narrowing it to only the minimum. Correct, Your Honor, who are not representative of the rest. And frankly, that's the whole point that the board is making if they're not representative. Yeah. Okay. We'll make sure there's no additional questions at this point. We'll be able to talk to you about it. Thank you. Thank you, Counsel. Dove? Thank you, Your Honors. May it please the Court, my name is Ron Dove and I represent PBS and the Public Television Claimants. I'd like to reserve three minutes for rebuttal. The Public Television Claimants are a large and diverse group of copyright owners, including producers of Sesame Street, Downton Abbey, American Experience, and thousands of other high-quality programs. These programs made up the large majority of Section 111 distance signals during the 2014 to 2017 period, reaching as high as 66% of all retransmissions by 2017. But instead of allocating public television a share of royalties commensurate with this dominant market share, the judges award public television only 11% to 25%. And the judges reached that erroneous result by adopting a zero-value approach to minimum fee cable systems and must-carry signals, impacting far more public television programs than any other type. The judges used, as we've been talking about, used a regression that calculated the price per minute for each type of programming, multiplied by the number of minutes of that programming. And that part was fine, you know, it's basic economics, price times quantity. But when applying that regression to the facts here, the judges discarded millions of minutes of public television programming, not only in estimating the value per minute, but also from the quantity of retransmissions, all because they claimed that as a category, those minutes had zero measurable value. And they then gave this regression evidence dispositive weight in determining public television share for 2015 to 2017. So the judges' approach was erroneous for two fundamental reasons that are, narrow reasons, actually. First, with respect to minimum fee signals, the zero-value approach marked an unexplained departure from precedent that was contrary to all the evidence. The judges then compounded that error by improperly excluding retransmissions from minimum fee cable systems, only to restore all that value through adjustments for every claimant group except public television. So just to understand the context here, I mean, I take it you don't disagree with the basic idea that because a must-carry obligation is a part of the mix here, that the analysis should try to figure out what role the requirement to carry might have in the market price. I mean, that it could have some distorting effects, that it's not a free market decision to carry, it's a requirement to carry. And therefore, if what we're trying to do is estimate the value that the market would place on it, we should do something to account for the fact that some of this might be coming about because of an obligation rather than an estimation of what the market would otherwise accommodate. Well, Your Honor, it's not irrational to look into that issue. And all the parties presented different methodologies, even the board survey, for example, you know, cable operators were surveyed even when they carried must-carry signals and were asked to value what those must-carry signals were. Public television put in its own methodology that regression methodology that looked at that. In fact, all the experts did that. It was only, you know, other claimants then looked at it and tried to discount from those methodologies to account for must-carry. But with respect to must-carry signals, the judge's zero-value approach was based on a fundamental misreading of the must-carry statute in our view. The judges assumed that must-carry signals had zero value simply because they were must-carry signals. But Congress made clear that copyrighted programs on must-carry signals are valuable and compensable under Section 111, and the record evidence confirmed as much. So I want to go now to the minimum fee in a little bit more detail. In particular, I'd like to draw the court's attention to the 2010-2013 allocation decision, which immediately preceded the one at issue here. There, the judges explained that minimum fee systems do reveal value, and they adopted a regression that included those systems. But in the decision below, the judges did the exact opposite. They asserted that minimum fee systems lack value, and they adopted a regression that stripped out those systems. Yes, Judge. Didn't that predate the WGNA factor into this case? It did, Your Honor. The 2010-2013 time period was before the WGN situation. But we needed a shift, you know, some adjustment. There was definitely an earthquake in the marketplace, with WGN being removed as, you know, all of this programming that was not public television, sports programming and other programming, was removed from the distance signal analysis. So it was a shift. Why would the prior precedent be controlling when you've got this major catastrophic shift? Because the prior precedent was based on general economic principles. It didn't really relate to the facts in the record. You know, the 2010-2013 decision recognized that there is value in carrying minimum fee signals because there are physical costs. If you choose to transmit a signal, there's a cost associated with that to actually retransmit it. There are opportunity costs. You're choosing one signal, say a public television signal, over another signal that you could have chosen. And so the panel talked about that distinction from a matter of economics as to why these minimum fee signals reveal value. So the judges, you know, in this proceeding, you know, removed millions of minimum fee minutes in determining both the price and the quantity. And this impacted public television disproportionately because it had many more minutes excluded, including every single minute from every cable system that only carried public television, which was more than 30% of all systems by 2017. And worst of all, Your Honors, the judges claimed that they were following the exact same approach that they followed in the 2010-2013 decision as we just discussed. And that's a textbook change in position violation. Not no one in this room, not the government, not the joint sports claimants, not the interveners has explained how it's not. And they do. They say that this violation can be excused because there were lots of minimum, lots more minimum fee signals in 2014 to 2017 than in 2010 to 13. But that just makes the error more egregious because it means that more valuable data, the 90% of data that we were just talking about, more valuable data was discarded. In any event, the judge's minimum fee approach was contrary to all the evidence. Indeed, every claimant expert concluded that minimum fee signals reveal at least some value, yet the judges still excluded those signals, the quantity of those signals from the analysis. If I could turn to the must-carry signals, the judges' zero-value approach to must-carry signals was unlawful multiple times over. For one, it was contrary to the must-carry statute. That statute expressly contemplates that must-carry signals can generate increased copyright royalties under Section 111. And the government doesn't dispute that. It attempts to defend the judges' zero-value approach by saying that there wasn't record evidence establishing that must-carry signals have value. But all the surveys and the regressions that the claimants proposed revealed that must-carry signals have at least some measurable value. So how did the judges end up where they did? For the judges, the statute was the evidence. They simply assumed that because there was a statutory requirement to carry the signals, those signals could reveal value, or excuse me, those signals could not reveal value. But Congress determined otherwise. It contemplated that royalties would be paid and allocated for must-carry signals. Now, as for the interveners, they would conveniently have public television stations pay royalties into the Section 111 pool for public television's own programming. And they would then have those same royalties reallocated to other claimant groups with no copyright in those programs. And that's what we're talking about here, is compensating copyright owners whose programs were actually carried, not in some hypothetical world, but actually carried by cable systems. In other words, the interveners want a windfall, but that's not the scheme that Congress designed. As with the minimum fee issue, the judges not only adopted a flawed zero-value framework, they also applied that approach in an arbitrary way. To identify must-carry signals, the judges relied on a fundamentally flawed methodology advanced by JSC's expert that no one except JSC defends. And when confronted with these flaws, the judges, they acknowledged the flaws, but they shifted the burden to public television and applied an adverse inference. And they required public television to supply a reliable methodology for identifying must-carry signals after the hearing was closed, even though public television's proposed methodology already placed value on every signal. And thus, there was no need for public television to identify must-carry signals in particular. So the judges got things backward. It's the judges who must support their decision with substantial evidence. And if any party has had a burden to identify must-carry signals, that was JSC, the claimant group, contending that those signals should be stripped of value. For these purposes, are we talking about the regression? Or what exactly are you talking about with respect to? With regard to must-carry signals? Yes, we're talking about the regression. The must-carry in Adjustment B, the must-carry, both the quantity of must-carry minutes is removed from the allocation. So the regression purposes. Yes, so I mean, what we're supposed to be looking at is whether what the board did is arbitrary. And on KA468, the board says, it notes that Doctors Marks, Bennett, and Majur all agree that including PTV must-carry in the regression results in an overestimation of the value of PTV content for all four years. So they're relying on experts who have come forward and said that putting must-carry into the regression analysis in this way is gonna overestimate. Right, but the way that they do that is they attribute zero value for must-carry signals. In other words, even though every expert accorded some value to must-carry signals, the judges adjust for it by totally zeroing out all must-carry signals from, the quantity of must-carry signals from the analysis in Adjustment B. There's no, despite all the evidence of that must-carry signals do have value, and despite the fact that Congress in enacting the Cable Act made it clear that distance carriage will result in, of the cable operators are to pay royalties for the distance carriage of must-carry signals. Despite all that, the panel decided that it should be zeroed out entirely, and that's why we view that to be arbitrary. At 469, doesn't the board say that's not what they're doing? Let's get it in front of me. It says not to do it with zero value. It's just saying in the regression analysis. Excuse me. So, 469 and column C, they say, the point is not that the programs on must-carry stations, including those subject to royalty indemnification payments, back to the CSOs, lack value. Rather, the point is that they lack objective and measurable value. Yes, Your Honor, and that's not true. They do have objective and measurable value that every expert concluded. Yeah. And the board talks about the experts that you called and said the experts for PTV and CCJG mistakenly seem to analogize must-carry PTV stations to CWO, must-buy carry PTV stations, to must-buy automobile attributes, seat belts and airbags, and to must-carry health insurance, which comes at a cost. There are two problems with this argument, and then they say first and second. So, you're familiar with that. I am familiar with that argument. Your argument is broader than what the board did. Well, the board did not articulate, or the overwhelming evidence in the record that was credited by the judges showed that must-carry signals have value. For example, the board survey that we've talked about, the judges credited that survey as a methodology. In that survey, over 95% of cable operators that retransmitted purportedly must-carry public television signals and that responded to the board survey indicated that those signals had value. They placed a number on it. And so, they go on to say that it would improperly count the distance signals from which the PBS indemnified the cable operators. So, that's their point, but they can't be measured. And you're saying that's just wrong because your experts said it could be measured. No, well, I think, Your Honor, for example, I talked about indemnification there. I think they just didn't understand how the indemnification worked. For a must-carry signal, and we laid this out in the briefs, for a must-carry signal, if a cable operator has to pay the royalty for that distant must-carry signal, but it can choose under the Cable Act, it can choose to seek out indemnification from the public television station whose it's being retransmitted. Okay, so cable operator pays. Cable operator may get that money back if it chooses to seek that indemnification. But that money that was paid was paid for public television programming. And it still needs to be distributed. It's still in the royalty pool. And in many cases, it's the only distant programming that's carried by the cable system is this one public television programming. So, when your argument then is, in part, that the board is just doing sort of a double speak here, because it's not really addressing your argument at that point. In that particular instance, yes, Your Honor. I think that's a good summary. One final point, Your Honor, and this gets to the sort of, what are we asking the judges to do here? The government's basic approach to the case is that it's complicated, and the judges wrote a long decision, and so this court should affirm. But a complicated record is no excuse for arbitrary decision-making. And there were simple, straightforward valuation approaches that were in the record, and that the judges could have adopted and applied to all parties without violating the APA. For example- So that the synthesis that the board adopted is the problem. The synthesis that the board adopted is part of the problem there. They're cherry-picking one place, cherry-picking another place. We need to have consistent application of these methodologies. So what would you be asking the board for? Well, what we would ask the board to do is to remand with instructions to issue a new decision that does not apply the judge's flawed zero-value approach. I've got that, but what I'm getting at is we push counsel to what they really want. They want to use the survey. So what does that mean? What we would want, we would want them, send it back to the panel, and they will have a choice. So they will look at that based on the instructions you give. They could have adopted any of the regressions that included, as long as they include minimum fee signals and must-carry signals, they could have applied the McLaughlin Adjusted Board Survey to all the parties, including public television, as they've done for the past two decades. Or they could have combined those approaches as long as they explain what they did and treat all the parties fairly. Any of these methods would have afforded at least rough justice in estimating what Section 111 requires. What I'm getting at is we have a board that says that's what they've done. And counsel are arguing, we have to grant the petitions because the board hasn't adequately explained and it's rejected things arbitrarily. So my point is, you send it back and get another four volumes of an opinion. And we're facing the same sort of problems. And I'm trying to get some sense of narrowing here so that we don't just get that. And we also don't get a one-page order that says we affirm our previous decision. Well, Your Honors, I think the panel needs to explain, but really what I'm asking them to do is to apply, they could apply the Tyler model, all right, without excluding minimum fee and without excluding must-carry, right, based on my arguments here. And that is consistent, entirely consistent with the board's survey results as adjusted by the McLaughlin adjustment, which as it's done for the last 20 years. So one side says, apply the survey, period. The other side says, well, not quite. We want some adjustments. You mean as to the board survey? Yes. Yes. I mean, we not just want, I mean, the board survey is biased against public television. Everybody, all recognize that. I didn't see it as a personal preference, but rather that you think it's legally required. Yes, it's literally required. It has to be adjusted, and that's why the panel's done it for the last 20 years. You know, there are, I think it's 33% of the systems only carry public television. In those situations, that's the only copyrighted programming that's being retransmitted. And what the McLaughlin adjustment does is for those situations where we're dealing with relative value, the relative value of public television on those systems is 100%. It has to be by definition. There's no other, you know, maybe WGN used to be there, and there were sports that used to be on that distance signal, but no more. That's 100%. And so it's a very simple and appropriate adjustment to make, and it should be applied here. The board has all this data available to it. It applied it to each claimant situation as relative to the circumstances. They look to expert testimony. You're asking us to kind of substitute our judgment for that expert testimony, and then come out with a different result. But I'm not finding, you know, based on Judge Rogers' question, what law or what weighing of substantial evidence that you want us to go after. You just all seem to have a different approach as to how the board weighed all of this, even with respect to them looking at other experts and utilizing what they deemed appropriate or not in the experts' testimonies. Your Honor, at least from public television's perspective, it's much narrower than that. You know, our argument with regards to minimum fee systems is that this is a classic change in position. They adopted, the panel adopted an approach in 2010 to 13, which we've explained becomes different because of the WG&A explosion. But the laws of economics don't become different,  Yes, the number of systems is different, but the laws of economics, and just the fact that there are opportunity costs and physical costs and other costs that actually demonstrate value, that prove that these systems have value, that doesn't, I mean, that stays the same. And yet they, you know, they completely reversed themselves and, you know, excluded millions and millions of public television minutes from the regression analysis. And that just, that's millions, that's minutes, that's copyrighted programs that are to be compensated in these proceedings. And that's what happened, and that is why that is arbitrary. And just curiously, have you done an analysis that if that was placed back in, how everybody would come back, come out? I mean, yes, your honor, I'm not, it's actually Tyler himself did that analysis. It's the model that Tyler himself preferred and advocated in this proceeding. It's the, his preferred, Sensitivity model. No, not the sensitivity model, the model that he actually proposed is the model that resolves these problems from public television's perspective. Mr. McPaul, I don't have any additional questions for you this time. Okay, thank you, counsel. Give you some time for rebuttal as well. We hear from the government now, Ms. Carson. Good morning, may I please support Sonia Carson for the government. The copyright royalty judges acted reasonably in applying a flawed record to the difficult, counterfactual, hypothetical question of relative marketplace value for an industry in which no free market has ever existed. The fact that all of the evidence in the record was flawed does not mean that the copyright royalty judges could not rely on it. Here the agency conducted a month long trial in which they admitted hundreds of exhibits, considered testimony from dozens of experts and wrote a painstaking opinion, acknowledging the flaws and accounting for them as best they could. The argument, as I think the colloquy with the appellants shows here is that the judges should have weighed some evidence more heavily than others in predictably a direction that favors the party who is advocating for their preferred position. But the problem here is of course, as the judges exhaustively explained that none of the evidence in the record is perfect and perfect is not the standard. The standard of review here is whether the judges allocation of royalties was reasonable supported by substantial evidence in the record. And here there can be no serious doubt that what the copyright royalty judges did was, for example, account for the fact that the BORTS survey just has a data gap. It's always had this. The JSC commissioned this survey and the BORTS media company excluded every cable system operator who retransmitted only either PTV content or content from the Canadian claimants group. Now, this is a gap that because it has existed before the McLaughlin adjustment was developed as one way to address it. JSC came into this proceeding with a survey that they chose to conduct in the same way. And the judges have to take the record as they find it. This is not the government's money. We get involved in these cases because the parties are unable to settle among themselves how the royalty should be distributed. And the project for the judges here was to take a look at all of the evidence that was in the record and decide as best they could what reasonable ways to approximate the entire market as a whole. How would a regression model sort of best approximate this hypothetical counterfactual industry that has never existed? How would a survey model sort of best approximate a hypothetical counterfactual free market that has never existed? And then individually with respect to each claimant group, how persuasive, how well does each frame of vision, whether it's regression or survey, map on to the type of content that the claimant retransmits? Can we start with, I do have some questions about how it all got brought together. Sure. Sort of picking one modal, one of the options for one of the category groups, picking another one for another one, and not knowing exactly how they mix them all up. I would like to get to that, but if we just start with each one in succession and we start with regression, if we could. So with the regressions, there's no doubt, everybody agrees that the regression was relied on to some extent, and particularly with respect to public television, I think is where the board relied on it the most expressly. So then if on the regression table, the one at 511 at least, which seems like a relevant one, if not the most relevant one, there is a 55% confidence interval to which the board takes note. And I guess my question is, I don't think you dispute that at some point the confidence interval will get so low that it wouldn't make sense to even take note of it, whatever take note means. That has to be true, I would think, right? Yes. So if it's a 10% confidence interval, it wouldn't make any sense to rely on it. So if it's 55, and I don't reject the premise that what the board is supposed to be doing doesn't have to meet the level of what statisticians said should be done to decide which clinical trial to give effect to if you're in the FDA or something, I understand that. But 55 just does seem like a pretty low confidence interval relative to what one normally sees, including even in this context in previous iterations. And so I'm just wondering, what do you understand the board to have done with the 55% confidence interval? And why do you think that was okay? Sure, so two points. I think it's helpful if I could just explain sort of in ordinary English what a regression model considers. It shows the correlation between how many minutes a given kind of programming a CSO had and how much of their budget they were willing to spend on distant retransmissions. And so the inference is that the regression will show that if a CSO, that if there is that relationship, if a CSO spends more of its budget and retransmits more of one category of programming, it values that category of programming relatively more. And so a confidence interval speaks to the strength of the correlation that the regression can establish. And there's no dispute here that the number of joint sports claimants minutes that were available for retransmission from 2015 on fell off a cliff. This is in part why the judges decided to adopt the Tyler model that had the above minimum fee only data because Dr. Tyler himself said that that was the data that showed with quote, the highest degree of confidence and here I'm at JA 549, that there was an inference that was relevant to willingness to pay and relative market value as the standard. So the confidence interval in and of itself, number one, does not sort of impugn the reliability of regression as an approach. And two, the judges candidly acknowledged that this model was not perfect. And that was accounted for in the allocation that the judges ultimately awarded, which for the joint sports claimants was much closer to the poll that sort of would have been suggested by the survey than the regression. And I'd like to illustrate that if I could. The joint sports claimants, if the judges had allocated purely based on the above minimum fee operator Tyler regression model, the joint sports claimants would have received 2.3% in 2015 to 1.56% in 2016, and 0.61% of the funds in 2017. Hold on just one second. I just wanna make sure there's so many numbers. I just wanna make sure I have the right chart in front of me. Do you have that somewhere that you can point me to or? So that's in the government's brief. I just wanna illustrate that the point is the regression model suggested not surprisingly that as sports were a category for which very few minutes of content were available for retransmission, that if one were to rely on that model alone, sort of as a comprehensive view of the industry, that the allocations to the joint sports claimants would be very low. But of course, what the joint sports claimants actually received was significantly more than that. The joint sports claimants. Where are you looking? So I'm looking at the government's brief at page 30. Okay. The joint sports claimants for 2015 received not 2.3%, but 11.42% for 2016, not 1.56%, but instead 10.72% for 2017, not 0.61%, but instead 12.36%. And this is because as the judges acknowledged, there is just a more limited ability for a regression model because of how it functions and the volume of data that is input to it to explain joint sports claimants programming when the number of minutes is so diminished. And this is why they overrated the survey evidence when it came to the joint sports claimants, not only because of the volume of data that was available to the regression, but because the judges expressively acknowledged that for some categories of programming, like devotional programming or like sports programming, one minute does not necessarily capture how subjectively valuable that kind of programming is for the consumer who received it. So I take the, just stepping back for a second. Sure. I think I understand that the point you're making, which is that, look, if you compare the regression results on one hand and the survey results on one hand and the sports claimants are saying, just discount the regression, like use the survey. That's what we really like. They actually got something pretty close to the survey. What the survey, I take that point, but I understand what they're saying is, but the regression still mattered for public television. And then if the regression is fundamentally flawed and you took it out, then we'd actually have gotten even more than we got because if you only use the survey, even for public television, then public television's share would have gone down some and our share would have gone up some more. And you should have only used the survey. You should have discounted this regression altogether because the regression is fundamentally flawed. It's just not even remotely reliable. So yeah, we got pretty close to where you'd be for ourselves if you just did the survey, but you let the regression seep back in with respect to public television, which in a zero-sum game redounds to our detriment. I think that that's what they'd be saying. And I don't think you'd probably dispute that it makes some difference to them whether the regression seeps in at all. Yes, of course. But as the judges explained, neither a regression model nor a survey model alone was the right or a reasonable even way to think about the entire industry as a whole. There are very different kinds of content that are involved here that are being retransmitted for some for quite a number of minutes, some for not many at all. And so the judge's task in determining what the relative marketplace value is, which is their task, which Congress left entirely to their discretion to decide, the question is willingness to pay. And when for some categories of content, the number of minutes is illustrative, and for other categories of content, the number of sheer minutes is not as illustrative, it's perfectly reasonable for the judges under these circumstances to make the very careful and painstaking decisions that they did. So I guess my question is though, I think I have great sympathy for the copyright judges. I mean, and it's an unenviable task. And I'll just accept your premise that there's no perfect solution here. And there clearly were flaws. Everybody thought there were flaws, at least in some measure to a lot of things across the board. But there's no doubt that the regression played a role. Yes. And if it's true, suppose that it was a regression that rested on a coin flip. I mean, even if it played a role and even if the sports claim has got pretty close to where they would have gotten otherwise, nobody could sanction the use of a regression that has embedded within a coin flip because that's the definition of arbitrariness. And so I guess the question is, if the regression did play some role, even if I know that in a kind of rough justice conclusion sense, you could say, look, this is not on rough injustice because got pretty close to where the surveys, which is what you the joint sports claimants really are drawing attention to, would get you to. I totally, I take that point. But if the regression played a role and there's just a fundamental flaw in the regression, and I'm curious as to why, I want to give you the chance to explain why that's not the case. Then I think we would still say, yeah, the regression played some role. It actually didn't inertia or detriment all that much because you got pretty close to where you are. This is a huge approximation. This is a very unenviable task that the copyright judges have. It got pretty close. I get the instinct to leave it alone, but if it has an element to it that is just resting on something that's just fundamentally flawed, then we have to at least take a look at that. And so on that, could you just help me with the regression and just tell me, why is the 55%, just two basic questions, which I think is map onto their two basic questions. Why is the 55% confidence interval? Why is that okay to rely on it in some measure, which it looks like it was relied on in some measure. I don't exactly understand exactly how, but relied on in some measure. And then why is it okay that the regression spit out negative numbers and that's a regression that we can still rely on in some way if it has negative numbers for scores? I mean, big picture, because all of the economists who offered regression models and evidence testified that the fact that there was a particular confidence interval does not sort of make the reasonableness of relying on it in any part, sort of stand or fall. The coin flip analysis is not, their analogy is not quite correct. Well, because I mean, statistically, a 55% confidence interval is the likelihood that the result is not, for example, the number on the page, but it is instead zero, meaning that there is absolutely no relationship, no mathematically significant relationship between the number of minutes of different types of content that are retransmitted and the amount of royalties as a percentage of their overall budget that cable operators spend. If the confidence- By confidence, by coin flip, I wasn't meaning to talk about 50%. I was talking about coin flip meaning, I'm just gonna do a coin flip to see if heads, this side wins, tails, this side wins. I'm saying that's the definition of arbitrary. I'm not sure that 50% actually is the definition of arbitrary in particular contexts. I was meaning heads and tails. So I wasn't trying to compare 50% to 55%, but I think there is, 55% as a confidence interval is lower than what one typically sees, including in this very context in previous iterations. And the judges acknowledge that candidly. By statute, one of the judges is required to be an economics expert. The current member of that panel who is the expert is David Strickler. And what the regression illustrates is the strength of the relationship between the number of minutes of a different kind of programming and how willing, what percentage of the overall budget a cable operator is willing to spend. And I mean, I suppose the judges could have thrown the proverbial baby out with the bathwater as to either. There was a gap in the survey data. There's been this gap for decades. Joint sports came and commissioned this survey. I don't know why they didn't have it done differently, but that was the choice that they made. And I wanna just make sure that I'm not suggesting that it's the pure numbers here that makes the judges rationale. Okay, I am not saying, hey, maybe they would have gotten a lot less, but instead they got more. And so it's all fine. We don't do that. We understand the court's decision in the settling of devotional claimants case. But I mean, the rough splitting of a difference as the court said in Johnson, between two fairly but not wholly satisfactory outcomes is a familiar permissible technique. And of course it is a zero sum pool. Every decision that is made with respect to one party affects another. This is in part why the structure of these proceedings is that the parties are incentivized to provide the proposals that most support an award to their group that is larger compared to others. It's not a flaw in the analysis. It's the judge's reality in terms of the evidence that was provided to them. And with respect to the joint sports claimants specifically, it is precisely because there was not a, more than necessarily 90 or 95% level of confidence about the strength of the correlation between the number of minutes and the willingness to pay that the judges overweighted the survey evidence in response. I do also want to- I'm trying to figure out how far do we go into the merits of any of the methodologies as well, because there's a lot of case law that suggests that we should defer. These are experts. We're not the statisticians. That's not quite our role. And of course we have to look at whether or not it's been adequately explained, but I just want to know what's your thought on how far we actually look into all of this modeling? Yeah, I mean, I think the Johnson case is instructive. The standard of review here by statute is the APA standard of reasonableness. And so we do not ask whether this panel would have reached a different conclusion if it had been presented with the same facts in the first instance. We ask, given what was in the record, how did the judges approach the problem? Did they act in a way that was consistent with their prior precedents? Did they explain the choices that they made, whether or not they were perfect or not? The record here and the determination are what we look at, and we look at how those match up. And I think as Judge Rogers, perhaps you said, I think it's fair to say that for every part of the record to which the parties are raising an objection, there is a corresponding part of the determination that explains why the judges reached the conclusion that they did. Nobody was gonna be happy. The proposals in this case asked for the judges all told to allocate 150% of the money that was actually available. And so there are inevitably winners and losers in these cases, and these cases only come to the copyright royalty judges because the parties themselves cannot agree on what an appropriate distribution should be. But that does not mean that the judges are required to attain mathematical exactitude as this court has observed that is nigh impossible. I think I don't disagree with a single thing you just said, and maybe I'm just not asking the question correctly, and maybe the question is off, but if I could just try one more time. So on the table on JA 511, so suppose the left-hand most column was a 10% confidence interval. Suppose it was 10%, and then it's the exact same thing on the page. The judges take note of the 10% confidence level because, and would that be okay? I think it's, and I'm not trying to fight the hypo, but I think it really does depend on what else is in the record. And why is that? So because the judges are bound to make a decision based on the evidence that the parties put in front of them. And so if what is in the record is information that supports a 10% confidence interval, it's fair because the parties have asked the judges to take a look at it. It's fair because somebody has said to the judges, we want X share of the pie, and we think that this math with this confidence interval supports our proposal. And the judges say, well, we are trying to figure out what relative marketplace value would be, how these different categories of content would sort of offset each other in a market that has never existed, that is entirely hypothetical, and that the judges can only take what is before them. So if the argument is, and I take the point that somebody put this in, so somebody thought it was relevant, it's before us, we can give effect to it. But I think one of the arguments that's being made is actually what this is about is the Tyler sensitivity analysis. And nobody actually thought that should be relied on the sensitivity, it seems like people are comfortable with the nonsense, if that's the right term, the nonsensitivity Tyler approach the baseline one. But once you factor in the sensitivity one, that's not actually something that anybody was putting forward. So even though it's in there. Well, I think, and I wanna address this point head on, because it also gets to a point that the joint sports claimants have made about whether they proposed adjustment to and sort of how the judges treated that. Dr. Tyler testified that the form of the model that gave sort of him the highest confidence that the data that it analyzed reflected willingness to pay was the above minimum fee operator data. And of course, in the three adjustments that the judges made to this model, there were reincorporation, there were adjustments that accounted for the fact that in some circumstances, the minimum fee operator data could shed light on willingness to pay. The judges made that adjustment with respect to the Canadian Claimants Group. They made that adjustment with respect to PTV. And so the notion that a party can sort of propose something in evidence and then disallow the judges from considering it is nowhere to be found in the entirely discretionary standard that Congress has set in determining relative marketplace value. And it's the same reason why it's really not correct to say that the joint sports claimants proposed adjustment to the fact that judges ignored that. I point the court to footnote 221 of the determination and also invite the court to compare the proposal from 612 to 614 of the SEAL Joint Appendix. This is the joint sports claimants proposed finding a fact in conclusion of law. They set out there what the results would be for adjustment one and their adjustment two through the survey. And then at SJA 617, where they actually make a request for the figures they want, they reproduce the figures from adjustment one, not from adjustment two. So the judge's task here is to determine reasonable marketplace value based on the evidence in the record. And that is what they did. None of it was perfect. They didn't ignore the fact that none of it was perfect. They quite forthrightly acknowledged it. And that is all that, you know, either the Copyright Act or the APA require. I wanna briefly address, if I could, a couple of those other specific points that the parties were made in response to some of the other questions. I see that my time is expiring. I'm pretty sure my colleagues are too, but I still have some more questions. Okay, so on the World Series question, I point the court to paragraph 71 at page 130 of the SEAL Joint Appendix. This is the page the JSC quote in their brief. And this is where they actually provide the number of subscribers that they believe meets the category of, you know, it's section 111 or nothing if they wanna watch the World Series. According to the Joint Sports Claimants, that's between 70,000 and 94,000 subscribers, which I understand amounts to 0.13%, maybe as much as 0.16% of the overall subscriber pool. So this is not a circumstance where the judges ignored the significance of sports programming. It's a point that they agreed with. They would not have overweighted the survey had they not. As far as the point about how the figures could end up in the final allocation being below what the Joint Sports Claimants characterize as a range of reasonableness, Your Honor, you were exactly correct. What happened was the judges individually for each category considered where in a range of rates would be appropriate for an allocation to fall. And that's based on how well a regression versus a survey sort of spoke to the kind of content that that programmer, that that program category involved. That's not an inherently zero-sum analysis, right? I mean, the fact that the survey describes sports claimants' content relatively better than it might describe PTV content is not, that's a qualitative conclusion, not a quantitative one. And so the judges conducted that assessment individually for each of the six claimant groups that participated in this proceeding. And the total was virtually 100%, but it was not exactly 100%. And so to allocate the funds that they had, the judges adjusted the numbers proportionally to reach an even total of 100. It's not as if the judges considered one range reasonable sort of right up until the final second and then decided inexplicably to assign a different number. So can I just ask about that? Yeah. Just to make sure I think I understand all of how the final assessment was made. So let's imagine a world in which there's only two categories of claimants, and there's two ways in which we could decide what the allocation is gonna be. Kind of like this, you have a survey one and you have a regression one, and then you have two categories of claimants. If the, is this what happens? So the board would say, okay, for category of claimants, A, the joint sports claimants, let's just say, the one mode that we think is better is the survey one. And the survey one for them gets them 55. And then for the second category of claimants, public TV, we think the better approach actually is the regression. And the regression one gets them 65. Okay, so then you put them in a hopper and you see 65 plus 55. Uh-oh, I've gone over 100. Okay, so I did 55 from one group, 65 from the other. Now I gotta kind of normalize that, get it within 100. I'll take the same ratio and just taper it down to get to 100. So it's gonna be a 5.5 to 6.5 ratio, but I'm gonna get it within 100. Is that roughly what happened here? That is exactly what happened here. So my question is, that's interesting. And it's not what normally envisioned so what one normally envisions is, we'll figure out which one of these approaches just does the best job as a general matter. And then, yeah, we might have to make some adjustments to that approach. But rather than kind of picking one from one approach and picking one from another in a way in which, you know, they can add up to 200, it could be you have 100 to zero on one, zero to 100 on the other one, we'll take 100 from here, we'll take 100 from here, put them both together, it gets to 200. We normalize it, each gets 50. I mean, you could do that, and I'm not sure it's arbitrary, but it does strike me as different to allow for an approach in which you're taking one from one column, taking one from another column, and then just kind of jamming them together. Because if I'm understanding the way this might have happened, although maybe I got it wrong. Sure, so first of all, a basic point, it is uncontroversial for the judges to make adjustments to models that the parties have proposed. To the individual, no question. Exactly, because at the sort of model level, the question is, what kind of glasses are you putting on to look at the entire industry? And for the 2014 portion of this proceeding, that question was not as difficult. But when it came to 2015, and all of a sudden we have 90 odd percent of the cable system operators paying only the minimum fee, we have regression models that indicate sort of levels of confidence of correlation between the number of minutes and the value of the programming that are wide, as Your Honor aptly pointed out. And on the other hand, we have a survey that systemically excludes portions of the market that choose to retransmit only one kind of content category. And neither one of those is sports, of course, excludes the cable system operators that retransmit only PTV or Canadian Claimants Group content. I mean, I suppose the judges could have said, hey, you know, for each one of you, the regression would say this, and the survey would say that, and we're gonna put it together and average them. I mean, Johnson, this first decision in Johnson would say that that was perfectly fine. But because of the record that they confronted in this case, the judges, I think to their credit, took even more pains to consider both how well a lens of looking at the industry worked across the board, and how descriptive it was for the type of content that each program group provided. And in that, again, the judges agreed with the Joint Sports Claimants, that's clear. It is apparent that for niche programming, simply saying, well, one minute is one minute is one minute is not a reasonable way to go about it. And so they didn't. I don't mean, again, to fight the hypothetical that there might be some point at which it's just, you know, it just absolutely makes no sense on its face, and there could be said to be no application of expert economic judgment or expertise to the decision. But I would submit that we are quite far from that. Are we understanding correctly then that there's two sets of numbers that they could have chosen from in the main, a survey set and a regression set? And then for different claimant groups, they started with a different baseline. Some of them, they started with the regression. For some of them, they started with the survey, and both of those had embedded with them adjustments. But as I understand what they said on J537 and then 561 and 562, they went by, and I take your point that doing it by claimant group makes a lot of sense because you've got to take note of the particularities that affected an individual claimant group. But for each claimant group, they figured out, actually, the regression makes more sense for you. For a different claimant group, it might be that the survey makes more sense for you. So we're heavily, we're largely, we're dispositively gonna use that one for the particular claimant group, right? Right, I mean, the judges explained that. They gave different weights to different models. This is not a case, though, of the judges sort of being bound to pick either the lower bound of one model or the upper bound of another model and justify sort of with precision every 10th of a percentage in between. I mean, for each claimant, the range is zero to 100% of the royalties that were collected during this period. And so I want to agree with your honor's characterization, but I just, I need to push back against the idea that there is a sort of a boundary that is imposed by one piece of evidence versus another because it's reasonableness on the record as a whole. And here we had a record that supported wildly different outcomes. And the judges grappled with both the industry-wide view and how well each lens sort of mapped on to this hypothetical counterfactual marketplace that has never existed. And then for each kind of copyright holder who was claiming a share of that money, well, you know, okay, there are some points to be made about whether this lens captures your content as well as it captures another group's content. And the judges weighed the evidence in the way that they explained and explained their conclusions ad nauseum. And- But the one thing they didn't explain is how exactly they got to the final figures. So, because they said things on J537 along the lines of, we heavily rely on the survey. But then if you look at the survey for a particular category, for a claimant category, actually the allocation doesn't map on to what the survey would have given you. It's adjusted in some way, and it could be adjusted more for some claimants groups than for others. And we don't have a through-line explanation of how the judges got from the amount for either the regression or the survey to the final allocation for each claimant group. So, I think that perhaps our disagreement is whether the through-line has enough math in it. Or detail, just to understand- Or detail to explain it. And I mean, here, I have to point back to this court's decision in Johnson and in the settling devotional claimants. It is not sort of the sine qua non of reasonableness that the judges say, well, for you, we think maybe 70, the regression model, 71% explained well how your content should be valued in a hypothetical counterfactual free marketplace that has never existed. I think if you just look at the figures, I mean, the judges are very clear about where the adjusted models, both regression and survey, come out in terms of the percentages, like the allocation percentages that they support. And for CTV, as my colleague acknowledged, the judges said, well, you know, we think it's about, regression and survey do about equally well in describing this kind of content. And so, we're going to weigh them equally. And they come up with an ultimate allocation that's about in the middle. I don't think that it's the judge's obligation to say, well, you know, for you, we think that, you know, a regression model explains only 8% of the potential hypothetical counterfactual value of your content, and then have a whole nother round of dickering about whether to be 8% or 8.1% or 8.2%. This touchstone is reasonableness. The parties, I understand, disagree about where the poles of reasonableness should be, and whether there is any sort of distance in between them that the judges can consider, or whether they have to take one another or another. The assumption has to be, in your analysis, that the judges acted reasonably. And even though the range was extensive, whatever it shows was reasonable. Maybe our discussion is, you know, they went to the middle, but suppose, you know, if you knew what factors they applied, you'd say, well, it really ought to be closer to 5% or 90%, not, you know, 55% or 52%, whatever it is. And all I'm responding to is this is a very different type of APA review than we normally do. I mean, the thought is that judges are not experts, but we have to understand what's going on. And I mean, the briefs do a great job in one sense, but the talents raise a lot of questions. And your response basically is, if we're just applying a substantial evidence reasonable test, the judges did enough. They took what was given to them and decided whether that evidence was persuasive to them in terms of what they had to do. Yes, that's exactly right. And that's the end of our review. Yes, your honor. So if they hadn't addressed a whole area of argument, that would be arbitrary and capricious, but they addressed everything. Yes, your honor, and indeed. And so unless, I mean, you heard counsel repellents here, they take very strong positions on there's no way the court can adopt your position because just actually, and I think that's what I understand the chief judge's questions to be exploring is we understand the words, but do we see the analysis that explains those words? And sometimes I do, and sometimes I don't. And I realized the board has a terribly burdensome task here and it's limited as you point out. So, so long as it's somewhere around what people were asking for claimants, that's good enough in this context. So your honor, I think it would be. And I think that the recovery royalty judges did much more than that here. I think the core of what we are sort of going back and forth about is when the judges say, we weight the survey evidence more heavily for one claimant versus another, do they need to define with a number what that means in order for the decision to be reasonable? Or why? Well, why they do explain. They explain that the survey evidence is more persuasive for the joint sports claimants compared to the regression evidence. And they try to account for that. Mathematical exactitude, again, this court has recognized is impossible. And I don't, I am unfamiliar with any case in which this court has ever said that reasonableness requires saying, well, if you think it's more heavily weighted than another, we have to hear you say that it's 71% instead of 50%. It might be a different story if the judges had said, well, we think the survey evidence is much more persuasive for the joint sports claimants. And so we're gonna weight it more heavily. And then the ultimate allocation was the regression model number. But we don't have that incongruity here because what the judges are trying to do is pick a number that is reasonable for each party sort of under both their individual circumstances based on the kind of content they have and based on what they know about how this market does and hypothetically could work as a whole. So here's one concrete example that I think is in the briefing. And it may have been mentioned earlier, but so the judges said that for both CTV and for program suppliers, the survey results weight heavily. I think they use the same location for both. And then if you, and if we look at 2015 to 2017, which I think is the relevant years for this, maybe they also did it for 2014, but I'm gonna disregard that for now. So for 2015 and 2017, the survey allocations for CTV, just look at 2015, for example, the survey allocation for CTV was 19.2 and the allocation for the judges was 19.78. Very close. It's not only heavily relied, but maybe really heavily relied, that makes sense. But then if you look at program suppliers, the survey allocation was 18.4 and the judges allocation was 28.29. So that's not to say that they didn't heavily rely on it, but it's quite a bit different from where CTV wounded up. And it kind of turns out to be in the middle of the survey versus the regression because the regression would have been 44.8, the survey would have been 18.4, 28.29 is closer to the survey than the regression, but it's in the middle. And that may be fine, but we just don't know because what we have is an indication that there's heavy reliance on the survey for both to different degrees, apparently, to pretty significantly different degrees because one of them's almost towing it exclusively to the survey. The other one's pretty far from the survey, not all the way over to the regression, but kind of in the middle. And that's what we have to go on. So we don't know exactly how it was weighed. We know there was weight given to it. Does that seem fine? Yes, because what the APA requires is not the mathematical precision, and I'm sorry to keep returning to that phrase, that the kind of inquiry that you propose would entail. If the ultimate number was completely inconsistent with the prediction that the judges gave for arriving at it or for trending in that direction, it would be a very different case. So do you think it would be inconsistent if the number was directly, if the statement was made, we heavily rely on the survey, and then the number turns out to be exactly in the middle of the survey and the regression? No, because the final number, recall, accounts both for how well the survey and regression evidence describes the particular kind of content in that category, but how it maps onto the other five categories that are also at issue. And so it's too simplistic to say, well, there was this number and there was this number, and they had to pick either something in between, and they had to say it was 50-50, and then if they were about this number, then that means it was unreasonable. I mean, that is just not kind of- I think I agree. I believe I understand this and agree with you, that because it's a zero-sum game, even if you rely heavily on one, even if you rely exclusively on one, it's not gonna wind up being that exact one because it's gonna be adjusted based on what happens elsewhere. I guess what puzzles me some is that that might be true, but then with one where you heavily rely, it ends up basically in exactly the same place. With another one in which you heavily rely, it ends up quite a bit different. I think there would be adjustments, but I would imagine that the adjustments would occur in a somewhat equivalent or proportional way such that you would see some predictable results. And I guess my question is, it doesn't turn out to be that way as between CTV and PS, for example, for 2015. I understand that. And that is a product of the reality that there are vastly different kinds of content that are all lumped in together under the Section 111 license. I mean, the Section 111 license is about retransmitting content. It's about sending it beyond its local service area, not about what somebody sees when they turn on the channel. And so the fact that, as I may have tried to express earlier, that the joint sports claimants type of content is better described or more reasonably described by survey data. I mean, it's true that because we've got it added up to 100 and we don't have unlimited money, that there's a sense in which it's zero sum, but it is truly a qualitative analysis. And the fact that the survey evidence might weigh more heavily for one group does not mean as a matter of what is reasonable or what the evidence supports, that the survey evidence must, as a result, be deemed to weigh less heavily for another. And look, if the judges acted in a sort of excess of earnestness and trying to go beyond the idea of what would be sort of the copy and paste model that we could apply here and what would that spit out? I mean, they certainly could have, but what the judges did in this determination was agree with, in the main, the party's arguments that they're making here today. I understand that the parties are saying, well, not only was that a good argument, it was a really, really, really good argument. And so my number should have been bigger instead of a smaller. That's not the sort of decision that this court super intends. And it's not the kind of question that is susceptible to the tasks that the judges have before them, which is to determine relative marketplace value, allocate a finite sum of money based on that, and do it in a way that is reasonable and supported by substantial evidence of the record. I'm sorry to belabor this. I have one more question, just one more question about the kind of picking from one category and picking from the other. I can understand the appeal of saying this category is more, this type of analysis is more explanatory for joint sports claimants. This type of analysis is more explanatory for public television. And so I understand the appeal of doing that. I guess my question is this. If we imagine the world in which there's only two categories and there's only two types of analysis, so the two categories are joint sports and public television, the two types of analysis are regression and survey. If the board says for the sports claimants, survey makes more sense. For public television, regression makes more sense. So that's what we're gonna do. By definition, aren't you saying if you say for public television, regression makes more sense and you use that number, aren't you necessarily then by using that number also using the regression number for the joint sports claimants too? Because if you bring in the 65 from there, you're necessarily bringing in the 35 for sports claimants too, because the 65 is just 100 minus the 35. So the 35 just necessarily gets baked in. And the same is true with the converse too. So picking one from here and picking one from there, I get it, but it seems like you're necessarily also picking the other one too. So what have you really gained by doing that? Well, first of all, we don't dispute that all of this because we're in a zero-sum world where the question is which dollars go where that every decision with respect to one party has some effect on another. I would suggest that it's different from saying that on the one hand, we think the best model for the PTV is the regression model. And on the other hand, there's something sort of disingenuous about us saying that we think the survey model is the best model. I don't think it's disingenuous. I just wonder what the ultimate effect of it is. I mean, the effect is that there is an effect, nobody disputes this, and the money has to be divided up. And the judges, including the statutorily required economic experts, looked at the evidence that was in front of them and made a reasonable decision, which they supported by substantial evidence and which they explained thoroughly. That is what the Copyright Act and what the APA requires. And as for the points about, if you don't mind me picking up just a couple of points that the other side made, the minimum fee station data and the must carry data, I'm happy to address that. But to Judge Rogers' point, we are not sort of zooming into the weeds level of what the judges did in these circumstances. They had the evidence they had, they made the best of it that they could, they explained their choices, and that is sufficient to affirm. That's the end of it in your view. Yes. And so our questions about the factors they took into account is just not part of this review. I don't know if I agree with that, because, I mean, if the explanation and the outcome was sort of black and white or seems like completely irreconcilable, I think you might say that the explanation was not. The chief point about, you know, in one instance it's very close, in another instance it's quite different. And yet we look, you say, at both in the same way. This is the scheme that Congress established and it encompasses many different kinds of content. In a marketplace where, I mean, as the judges observed, the sort of strongest factor in a cable system's actual decision-making is inertia. We're not dealing with an industry where on the demand side we have a copyright consumer that is sort of parsing this, you know, different content very carefully. It is a difficult task. It is a square peg in a round hole in a triangular tube. It is a really challenging exercise, inevitably, because of the way that the statute operates. But the fact that the evidence was flawed, the judges acknowledged it, the judges accounted for that. They reached conclusions as far as the final numbers that they explained and that are reasonable. And that is the end of the analysis. May I ask that this determination be affirmed? Thank you, counsel. We'll hear from intervener's counsel now. Inertia may or may not explain why some unnamed homeowners might still have a DirecTV satellite dish in their backyard, but... May I please record, I'm Matthew McLean from the law firm Pillsbury Winthrop Shaw Pittman. I represent the Settling Devotional Claimants, but today I'm speaking on behalf of all four of the joint interveners, the SDC, the Canadian Claimants Group, the Commercial Television Group, and the program suppliers. And I would say that during the five weeks of hearings involving six parties, 33 live witnesses, hundreds of exhibits, these very complex econometric models that we're talking about, survey data, the numerous industry professionals that testified, the four of us joint interveners disagreed on plenty. But today we do come here agreeing on two things. First of all is that in the face of this very extensive, very complicated record, the board came to a reasoned decision supported by substantial evidence. And the other thing is this, some of these funds at this point we're talking about as far back as 2014, some of these funds were deposited more than 10 years ago. And as this court has recognized, royalty distribution can never be an exact science. Rough justice is bound to prevail. In this court's words, perfection in dividing up this royalty pool, much less consensus, is simply not going to be attainable. Now many of the same issues that we're debating right here today and many other new issues are now before the board again in the next round of proceedings as they have been in prior rounds of proceedings. And that's as it should be and in fact this court has expressly contemplated as a reason against an overly, adopting an overly inflexible approach in reviewing the Copyright Royalty Board's decisions. As this court contemplated in the 1998 NAB decision, in the annual determination process, the claimants would be able to improve upon the quality and the sophistication of their evidentiary submissions. So in the next, in the prior round, from this proceeding from the prior round, the parties have improved upon, sharpened their arguments, brought in new arguments, brought in changes to the marketplace. In the next round, we're going to do the same thing and we're going to incrementally get, hopefully, better at measuring this amount. But the standard that this court applies to what the judges are doing is a deferential standard. It's a standard that asks, did the judges come within a zone of reasonableness? And that word zone, it has a meaning here. I mean, and the ends of that zone are not necessarily going to be well-defined. But at the end of the day, Congress intended and Congress directed that these decisions were going to be made by judges, not by econometricians, which means that they're going to be able to look at these econometric approaches, the survey data, all of these kinds of data points, consider them as reference points. But then at the end of the day, they have to make a judgment call which inherently involves weighing different evidence. So I definitely want to get into the quantitative evidence because that's mainly what the petitioners are bringing up. But in doing that, I would ask the court to bear in mind and to look at it through the lens of two things. But first of all, the standard that the judges were applying is one of relative marketplace value, not absolute value. And none of these quantitative techniques were intended to measure in absolute terms. We're talking about the proportion of value, one category against another. And so in balancing those, you have to take that into account. The second is, and this is very, very important, is don't discount the qualitative, the qualitative industry-based evidence. The industry experts from cable system operators, from television stations, an appraiser of media assets, these qualitative, the quantitative approaches were reference points. And that's a word that the judges have used that this court has used. The quantitative points provide reference points, but nowhere close to the whole picture. At the end of the day, there is a judgment call that has to be made. And it's not necessarily going to be directed by X percent times X percent is Y. That's why the zone of reasonableness is the standard that this court has applied. So going to these quantitative approaches, and there are a couple of points I want to make quickly. First of all, today, the petitioners are taking some pretty hard-line positions, okay? In the court below, they were much, much softer on some of these same issues, okay? JFC's counsel today cited Dr. Rubenfeld. That was our expert witness, not theirs. Their own expert witness acknowledged that the above-minimum fee data in a regression analysis or data from systems above minimum fees can be informative and were informative in prior proceedings. They disagree that they were as informative in this proceeding, and the judges took that into account and accordingly gave less weight to the regression analysis than they did in the prior proceeding. PTV, similarly, public television's own expert witness, their own expert econometrician, presented an alternative analysis on above-minimum fee data only. It is not the case that the judges gave zero value to PTV minutes in below-minimum fee systems. The judges weighed all the regression approaches that were presented, including those that included minimum fee systems. They relied primarily on the regression on above-minimum fee systems, and then they identified the direction and approximate magnitude of potential biases, and they did the exact same thing with respect to the BORTS surveys. They identified a known bias, a bias that JSC itself, the Joint Sports Claimants themselves, admit that all parties agreed existed in the survey. They considered multiple different methods of performing that adjustment, and they chose a method, and they explained the choice that they made. They did this with both of those two techniques, and then Judge Srinivasan, as you, Chief Judge, I'm sorry, Chief Judge Srinivasan, as you said, they then made choices. Are we going to be closer, not necessarily exact, but closer to one or the other? And then, of course, they had to normalize that to equal 100%, which means you're not gonna get exact percentages, and they explained, in rough terms, the direction and the magnitude of the changes that they were making. And that may seem like an unusual way of doing things, but it is exactly the way it was done in the last proceeding, the program suppliers, this court's decision, the program suppliers proceeding in 2020. They did the exact same thing. They relied on survey expert regression expertise. They explained why some categories, they used one more than the others, and then they normalized it to 100%. They did essentially the same thing in the 1998 NAD decision, which this court also affirmed. So this is essentially the same technique that has been affirmed in multiple decisions of this court. I see that I'm out of time, but, of course, I'm happy to answer any of your questions. Thank you, counsel. We request the court to affirm. Thank you. Thank you. Speed or we'll give you three minutes for rebuttal. Both sides, we'll give three minutes for rebuttal. And, of course, if you have questions on that. Okay. Thank you, Your Honor. So I want to emphasize that the regression is wrong for everyone, not just sports. And one point I didn't make before is that the regression calculates that the CTVs relative percentage of subscriber minutes is cut in half between 2014 and 2015. That's at JA248. But its allocation under the regression stays the same. Devotional percentage goes down between 2014 and 2015, but its allocation under the regression goes up. Program suppliers stays the same in terms of minutes, percentage minutes, but its allocation goes up by a third. And, again, that's the chart with minutes is at JA248. The regression calculates that the value of a minute of sports is 30% less in 2015 than in 2014. And you see that if you go to the JA241, the coefficients for JSC for compensable minutes are 30% lower. And so all of this is showing that the regression is not calculating minutes at the per minute value for anybody. So let me turn to your question about the synthesis. So if you look at what the government said on page 26 of its brief, is that the board for 2014 was giving equal weight for JSC to the board's survey and to the regression. And that's obviously not what the results showed. With respect to your specific question about JA561, I took a look at that. And I think what's going on there, so if you actually look at the 2014 shares, they add up to 99.9 under the survey. That's the adjustment B. And then the survey adds up to 100. And so I think what's going on is that when the board does its completely unspecified combination of those two things, it somehow gets to over 100. And that's part of the problem. We don't know how they did it. But I'm not sure if it's making sense. But the reason why sports is below those two numbers is not some artifact of the fact that the survey and the regression add up to more than 100. It's an artifact of the fact that the board's totally unclear weighting adds up to more than 100. So that can't explain why JSC is below both of those things for 2014. I wanna correct one thing the government said, which is that with respect to the 55%, Dr. Tyler did not propose reliance on 55%. If you look at the page where the board does 55%, they say it's derived from one of his charts. If you know the standard error, you can just derive any confidence interval you want based on some basic equations. There's absolutely no regression expert in this case who said that it was proper to rely on 55%. And we never got a chance to explain that it wasn't proper to rely on 55%. You had a chance during the hearing. I think we raised some things during the rehearing petition, but we weren't required to raise everything during the rehearing petition. I'm sorry? You say you didn't have a chance. You did. That's all I'm saying. Whether you chose to do it or not, it's another issue. But we're raising it in this court and it's arbitration. I'm not gonna belabor this. I'm sorry, Your Honor. But I would like to just follow up on that. I mean, if you knew about the reliance on the 55% as of the initial decision, right? Yes. Okay. So you could have made an argument as to the 55% on rehearing before the board. What we said on rehearing before the board was that reliance on the above minimum fee was arbitrary for a variety of reasons. I don't recall if the 55% was in our rehearing petition or not, but we absolutely said that reliance on the above minimum fee title regression was completely arbitrary. No, we understand that. And the board responded to the arguments that were presented on rehearing. That's my report. So, and Your Honor, I think, let me talk also, the government said that the, Tyler said that the above minimum fee gave him the most, highest confidence. If you actually look at his testimony at JA 216, that's not what he says at all. What he says is that as to that 10% of people or of systems, he has the most confidence, but not that he has the most confidence that if you take that 10%, you can apply it to the entire. No, he says that in two different places, at least that I saw. So it's just the board saying, you know, look, the expert, here's the objection. And he said he has confidence still from the analysis as I understood what the board. So, so just a couple of very quick points. There was no response on our argument that it was arbitrary to apply the McLaughlin adjustment to everyone but PTV, which is the only claimant it was designed to help. The only claimant it was designed to help, the board says it's arbitrary to apply it to them. And that requires remand if nothing else does. And with that, my final point is that with respect to our second adjustment, I think the government said we didn't propose it, but we did on SJA 614 and SJA 615. We proposed that adjustment. We said we preferred adjustment one, but that alternatively adjustment two was a good adjustment as well. But you preferred adjustment one. That's what government said. We did. Here today. We did prefer adjustment one, but we very explicitly said that adjustment two was an alternative. Just as a preservation point, you're saying you- Yeah. Well, we said both were economically sound. We were proposing adjustment one, but if the board rejected adjustment one, adjustment two was certainly better than McLaughlin. That's what we said. And that certainly preserves it, your honor. Thank you. Thank you. Mr. Dowd, we'll give you also three minutes. Thank you, your honor. Just wanted to focus briefly on, I think our main point of this. It was arbitrary and capricious to assign zero value to all the programs on all of the cable systems that were paying the minimum fee. That was 90% of the retransmissions at issue. So this is not a weeds level situation. It's not a rough justice situation. It is the fundamental flaw that excludes massive quantities of programming and particularly impacts public television because the panel placed this positive weight on the regression for public television. But if the board believes that the regression cannot measure value on minimum fee systems after the WGN conversion, then, or if the board, if it believes that on remand, then the board would need to rely on the survey. It credited the survey for measuring the value of minimum fee systems. I mean, the survey measured that. And so adjusted by McLaughlin, that would get to the point where you just rely on that one piece of evidence for all the parties and you wouldn't have the cherry picking problem. The Tyler sensitivity was not endorsed by anyone as a measure of relative value. And I think that's important to keep in mind. Unlike the joint sports claimants, we are not just advocating for our preferred method. We're saying if there is some evidence, it's okay to adopt that. But there was no evidence that minimum fee systems should be accorded zero value. All those, that quantity of minutes, that millions of minutes should have been excluded from the analysis. There was evidence of value from every single party for both minimum fee systems. And so you're taking issue with the board's statement that it couldn't be accurately measured, right? That's what we were going through in the record when you were first arguing. I think in part, Your Honor, we're taking issue with that, but really we're taking issue with what they did with that. They said it couldn't be accurately measured, so they just decided to give it zero value, to totally zero out all these minutes of programming. They gave a reason. Well, they gave a reason. Your argument today, just let me be clear, because I may have misunderstood your argument. Your argument is that they didn't give any value. And the board said, well, it couldn't be accurately measured. And is your argument that, no, that's incorrect because there was expert testimony? Yes, well, yes, Your Honor. All the evidence in the record suggests that it could be measured. And all the evidence in the record suggested that it was not zero. So what did you think the board meant when it said, could not accurately be measured? I think they were frustrated with what, we've been frustrated with here today, Your Honor, which it's very hard to pinpoint. You've got different methodologies coming at it differently. But the reality was that the evidence before them clearly measured it. The board surveyed minimum fee systems, and measurements were given as to the value of the programming on those systems. The regression analyses, all the parties put forward regression analysis, their preferred models measured the value, had valuations of those minimum fee systems, and did not exclude just to throw them out of the analysis. So I think that they were just frustrated with the ability to get that precise figure. And- Okay, thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan; Childs; Rogers